**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Elizabeth A. Gentry, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.　　I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since May 2016. Prior to holding this position, I was a police officer from November 2004 until becoming a SA with the ATF. From approximately November 2004 until approximately March 2006, I was a deputy with the Lafayette County, Missouri, Sheriff's Department. From approximately March 2006 until approximately May 2016, I was a police officer with the Kansas City, Missouri, Police Department ("KCPD"), and held the positions of patrolman, detective, and sergeant. As a detective, I was assigned to the Narcotics and Vice Division, and participated in numerous investigations involving firearms and narcotics trafficking. I became employed by the ATF in 2016 and am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program, as well as the ATF National Academy Special Agent Basic Training Program. I also hold a bachelor's degree in Criminal Justice and a master's degree in Criminal Justice Administration. I have participated in specialized training relating to firearms, firearms trafficking investigations, and drug investigations. As a SA with the ATF, I have conducted and/or participated in investigations involving firearms, arson, explosives, controlled substances, contraband cigarette trafficking, fraud, and money laundering. I have written and executed federal search warrants and arrest warrants. I have participated in the execution of numerous search warrants including search warrants relating to the illegal use, possession, and trafficking of firearms, the illegal use and possession of explosives, and the illegal use, possession, and distribution of controlled substances.

1

I have conducted and/or participated in investigations resulting in the seizure of contraband, including firearms, narcotics, explosives, currency, vehicles, real estate, and bank accounts. I am a current member of ATF's National Response Team ("NRT"), which specializes in gathering evidence to support criminal prosecutions related to explosive and arson related incidents.

2.      By virtue of my training and experience, and through consultation with other SAs and officers who have conducted firearm and narcotics investigations, I have become familiar with the methods used by firearms and narcotics traffickers to import, transport, safeguard, and distribute firearms and narcotics.

3.      The statements in this affidavit are based on my personal observations, my training and experience, my investigation of this matter, and information obtained from other agents and witnesses. Where statements made by other individuals (including other SAs and law enforcement officers) and information contained in reports and other documents or records are referenced in this affidavit, such statements are described in sum and substance and in relevant part only. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth the facts that I believe necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846, 843(b), as well as 18 U.S.C. § 924(c), are currently located within the Snapchat servers.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1), 846, and 843(b), that is, distribution of controlled substances, possession with the intent to distribute controlled substances, conspiracy to distribute controlled substances, and use of a communications facility to facilitate drug trafficking activities; and 18 U.S.C. § 924(c), that is, use of a firearm in furtherance of drug

2

trafficking, have been committed by an individual identified as **Carreon BROWN**. There is also probable cause to search the information described in Attachments A1–2 for evidence, contraband, and/or fruits of these crimes, as described in Attachment B1–2.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND ON SNAPCHAT

6.      Snapchat (incorporated as Snap Inc.) is one of the most popular applications for sending and receiving "self-destructing" messages, pictures, and videos, which are referred to as "Snaps." The company processes approximately 700 million Snaps every day on Apple's iOS and Google's Android operating systems. Snapchat users access the application frequently. Snap Inc. has a headquarters in Santa Monica, California.

7.      A "Snap" is a picture or video message taken and shared with other Snapchat users in real-time. The sender of a Snap has the option of setting a timer for how long a Snap can be viewed. Once a Snap has been viewed, it is deleted from the company's system and is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. Snapchat deletes each Snap from its servers once all recipients have viewed it. If a Snap has not been viewed by all recipients, Snapchat retains the Snap for 30 days. The application notifies other users when they are online so they can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device.

Pictures can also be send from the saved pictures in the photo gallery of the device. Accessing a Snapchat account and "snaps" constitute "electronic communications" within the meaning of 18 U.S.C. § 3123. *See* 18 U.S.C. §§ 3127(1) and 2510(12).

8.      "Stories" is a collection of user submitted "Snaps" from different locations and events.  A Snapchat user, with the location services of their device turned on, can contribute to a collection of Snaps regarding the event. For example, multiple different Snapchat users at a rave could all contribute to the same "Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Stories," a Snapchat user can keep a sort of photo/video diary using the "Story" feature. Each Snap in a "Story" documents the user's experience.  Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friend. Stories are visible to other users for up to 24 hours.

9.      "Memories" is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted "Stories," and photos and videos from their phone's photo gallery in "Memories." A user can also edit and send Snaps and create "Stories" from these "Memories".  Snaps, "Stories," and other photos and videos saved in "Memories" are backed up by Snapchat and may remain in "Memories" until deleted by the user.

10.      "Snapcash" is an online money transfer service offered by Snapchat. The actual business platform is run by "SquareUp," the distributor of a mobile credit card reader and application Square Register. Snapcash can be used to transfer money between Snapchat users using a linked, U.S. issued Visa or MasterCard debit card only; using credit cards is not permitted. Snapcash can only be sent to other users who have a linked debit card. Snapcash has a $250 weekly

limit but can be upgraded to a $2,500 weekly limit. Users who upgrade have to provide their full name, date of birth, and Social Security number.

11.     While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a Snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the Snap before it disappeared.

12.     Snapchat asks users to provide basic contact and personal identifying information to include date of birth. When a user creates an account they make a unique Snapchat username. A Snapchat username is a unique identifier associated with a specific Snapchat account, and it cannot be changed by the user. A Snapchat display name, on the other hand, is not a unique identifier and can be created and changed by a user to indicate how the user will appear within the app. Below is an example from Snapchat illustrating the difference between a username and a display name:

5



13.     An email address is required to register a Snapchat account and a new user must also provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code which must be entered before proceeding with the registration step. However, a user may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

14.     Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control ("MAC") address and the International Mobile Equipment Identifier ("IMEI") or Mobile Equipment Identifier ("MEID") of devices used to access Snapchat. In the event the Snapchat user's application crashes, the company also collects a list of other installed applications on the device to detect any potential software conflicts.

**PROBABLE CAUSE**

15.     In January 2020, the ATF initiated an investigation regarding an individual identified as **BROWN**. **BROWN** was believed to be involved in violent crime in Kansas City,

6

Missouri, and had a pending robbery charge in Clay County, Missouri. **BROWN** was also believed

to be involved in the sale of marijuana. KCPD records also documented **BROWN** as suspected of

being involved in multiple incidents involving firearms.

***Purchases of Marijuana from BROWN by ATF Agents in January 2020***

16.     On January 9, 2020, two ATF SAs working in an undercover capacity (hereinafter

"UC#1" and "UC#2") conducted a controlled purchase of marijuana from **BROWN**. Prior to the

purchase, UC#1 was provided with the Snapchat username (a unique account identifier)

Almightcdot5, and vanity name (or display name, which is not unique) "Cdot" (hereinafter

**"Target Account 1")**. Your affiant is aware that SnapChat is a popular mobile phone application

for sending and receiving "self-destructing" messages, pictures, and videos. Your affiant also

knows Snapchat and other social media outlets to commonly be used for communication between

drug traffickers and drug customers, in order to advertise, arrange, and complete drug purchases.

**Target Account 1** was believed to be the Snapchat name utilized by **BROWN** to distribute

marijuana. UC#1 began communicating with **BROWN** by contacting him at **Target Account 1**

and arranged to purchase marijuana from him. Utilizing **Target Account 1, BROWN** directed

UC#1 and UC#2 to respond to 4510 North Agnes Avenue, Kansas City, Missouri. Once UC#1 and

UC#2 arrived, they met with **BROWN**, who sold UC#1 approximately 31 grams of suspected

marijuana in exchange for $200 in ATF funds. Following the transaction, the purchased substance

was field tested and gave a positive result for THC, the active ingredient in marijuana.

17.     On January 16, 2020, ATF UC#1 communicated with **BROWN** via **Target**

**Account 1** and arranged for another purchase of marijuana from him. UC#1 also observed

**BROWN** post what appeared to be photographs of marijuana on **Target Account 1**. Utilizing

**Target Account 1**, **BROWN** directed UC#1 to respond to 4510 North Agnes Avenue, Kansas

7

City, Missouri. Once UC#1 and UC#2 arrived, they met with **BROWN**, who sold UC#1 approximately 29 grams of suspected marijuana in exchange for $200 in ATF funds. Following the transaction, the purchased substance was field tested and gave a positive result for THC, the active ingredient in marijuana.



18.     On January 30, 2020, ATF UC#1 communicated with **BROWN** via **Target Account 1** and arranged for a third purchase of marijuana from him. Utilizing **Target Account 1, BROWN** directed UC#1 to respond to 4510 North Agnes Avenue, Kansas City, Missouri. Once UC#1 and UC#2 arrived, they met with **BROWN**, who sold UC#1 approximately 29 grams of suspected marijuana in exchange for $200 in ATF funds. Following the transaction, the purchased substance was field tested and gave a positive result for THC, the active ingredient in marijuana.

### *BROWN's Involvement in a Drug-Related Robbery on October 30, 2020*

19.     Due to the COVID-19 pandemic, a period of time elapsed before ATF agents were able to conduct additional meetings with **BROWN**. In October 2020, ATF agents learned

8

**BROWN** continued to sell marijuana, as he was involved as the victim of a robbery where **BROWN** was selling individuals marijuana and utilized a firearm for protection.

20.     On October 30, 2020, KCPD officers were dispatched to two reported shooting scenes within a short time period. At approximately 10:47 a.m., officers were dispatched to 320 NE 94th Street, Kansas City, Clay County, Missouri, where they made contact with **BROWN**. At approximately 10:58 a.m., officers were dispatched to NW 68th Street and 169 Highway in Kansas City, Missouri, where they made contact with Shion **KENDALL-HODGE** and Nadarius **BARNES**. As detailed below, it was eventually determined that both incidents were connected and a robbery/shooting occurred at 320 NE 94th Street, resulting in injuries to **BROWN** and **KENDALL-HODGE**.

21.     At approximately 10:47 a.m., KCPD officers were dispatched to 320 NE 94th Street #346, Kansas City, Clay County, Missouri, regarding a reported shooting. Upon arrival, officers made contact with a male identified as **BROWN**. **BROWN** told officers that he had been shot in the buttocks. **BROWN** was transported to the hospital for treatment.

22.     Detectives contacted **BROWN** at North Kansas City Hospital. After being read the *Miranda* warning, **BROWN** stated that he was robbed by two unknown black males and one of the males shot him. **BROWN** stated that he was contacted by an unknown person via a SnapChat message from Snapchat username bpljuzilla_10 and vanity name "Glizzy" (hereinafter **"Target Account 2"**), who wanted to buy marijuana from **BROWN**. **BROWN** stated that, when the individuals arrived, **BROWN** went downstairs and got into the backseat of a vehicle occupied by two individuals. **BROWN** explained that he sells a variety of strains of marijuana with different potencies. The suspects requested a higher potency, so **BROWN** went upstairs to his apartment approximately three times. **BROWN** provided the details for **Target Account 2** to investigators.

9



23.     **BROWN** stated that when he returned, he entered the back seat of the vehicle and handed the marijuana to the suspects. A struggle eventually began and the individual sitting in the front passenger seat attempted to restrain **BROWN** by the waist, attempting to keep him in the vehicle. **BROWN** stated that he felt what he believed to be a gun against his back. **BROWN** stated that the front passenger warned him that the driver had a gun and was going to shoot him. **BROWN** said that he was eventually able to exit the vehicle and heard a loud "pop." **BROWN** also stated that he shot back once at the vehicle as he ran from it. **BROWN** stated that he ran upstairs to his apartment and called police.

24.     While at the hospital, **BROWN** signed a consent to search his apartment to recover his firearm. A search of **BROWN's** apartment yielded a .45-caliber Glock handgun bearing serial

number LYN809. **BROWN** also provided the Snapchat username Bandmandot (hereinafter

**"Target Account 3"**) as the Snapchat account he utilized during this incident.



25.    Meanwhile, as the initial shooting call was being handled, at approximately 10:58

a.m., KCPD officers were dispatched to NW 68th Street and 169 Highway in Kansas City,

Missouri, following another shooting report. Upon arrival, officers located a 2012 Hyundai Sonata,

bearing Kansas license plate C519723, which was pulled over in the southbound lane of 169

Highway, just north of the NW 68th Street exit. Officers contacted **KENDALL-HODGE**, who

was in the passenger seat. **KENDALL-HODGE** appeared to have been shot. Officers also

contacted **BARNES**, who was in the driver's seat of the vehicle.

11

26.     **BARNES** initially told officers that, a few minutes prior to calling 911, he was picking up **KENDALL-HODGE** from an unknown apartment complex north of the current location. **BARNES** stated that, when he arrived, he heard three to four gunshots and observed **KENDALL-HODGE** run to his vehicle and get in the passenger seat. **BARNES** stated that he did not see who was shooting, but **KENDALL-HODGE** appeared to be shot. **BARNES** drove **KENDALL-HODGE** to NW 68th Street and 169 Highway, where he was forced to pull over due to a flat tire. **KENDALL-HODGE** then proceeded to call 911.

27.     **KENDALL-HODGE** was transported to an area hospital. The Hyundai Sonata was towed to a KCPD tow lot. Officers noted an apparent bullet hole in the rear passenger tire of the vehicle. The vehicle was later searched pursuant to a search warrant issued in Jackson County, Missouri. A significant amount of blood was noted on the front passenger's seat and a bag containing a green, leafy substance was recovered.

28.     Detectives contacted **KENDALL-HODGE** at North Kansas City Hospital for a statement, which **KENDALL-HODGE** refused to provide. It was determined that **KENDALL-HODGE** was shot. Law enforcement suspected that **KENDALL-HODGE** and **BARNES** were the individuals from the incident that initially occurred at NE 94th Street at 10:47 a.m.

29.     **BARNES** was detained for questioning regarding the incident at 320 NE 94th Street. After being read the *Miranda* warning, **BARNES** stated that he was contacted by **KENDALL-HODGE**, who requested **BARNES** pick him up via text and provided **BARNES** a "pin drop" of his location. **BARNES** told investigators that, when he arrived, he heard two to three gunshots as **KENDALL-HODGE** approached his vehicle. As **KENDALL-HODGE** got into the front passenger's seat, **BARNES** realized **KENDALL-HODGE** was shot in the arm and shoulder. **BARNES** stated that he grabbed **KENDALL-HODGE's** phone, because his phone is Wi-Fi only,

12

and looked up how to get to a hospital. **BARNES** started driving and realized a wheel on the

vehicle was damaged, so he pulled over to call 911.

30.     After additional questioning, **BARNES** later admitted that there was a third

individual in the backseat of the vehicle that **BARNES** "kind of knows." **BARNES** stated that

"something" happened between **KENDALL-HODGE** and the third party in the back seat, but

stated that he did not hear what was said due to the music being loud. **BARNES** stated that the

third party in the backseat pulled out a gun and shot **KENDALL-HODGE**. **BARNES** stated that

he put the car in drive as the individual in the backseat was getting out and heard more gunshots

as he drove away. **BARNES** stated that he was not sure if **KENDALL-HODGE** had a gun.

31.     The .45-caliber Glock handgun bearing serial number LYN809, which was

recovered from **BROWN's** apartment on October 30, 2020, was test-fired and entered into the

National Integrated Ballistic Information Network ("NIBIN"). The test fire revealed presumptive

matches to multiple firearm related incidents, to include an aggravated assault on or about April

26, 2020; an aggravated assault on or about May 1, 2020; a homicide on or about June 26, 2020;

an aggravated assault on or about September 8, 2020; and a recovered shell casing on October 29,

2020. This suggests the firearm may have been used in the aforementioned incidents.

### *Marijuana Purchases from Carreon BROWN in February 2021*

32.     In January 2021, ATF agents learned **KENDALL-HODGE** was the victim of a

homicide. ATF agents continued to follow **BROWN's** social media postings and noted **BROWN**

established a Snapchat account with username cdotstaymobbin and vanity name Taliban

(hereinafter **"Target Account 4"**). ATF agents began to look at BROWN's social media postings

on **Target Account 4** and discovered that it appeared BROWN continued to sell marijuana. ATF

13

agents recontacted **BROWN** through **Target Account 4** for the purpose of setting up a marijuana

transaction with him.



33.      On February 2, 2021, UC#1 contacted **BROWN** via **Target Account 4** and

arranged to purchase marijuana from him. Utilizing **Target Account 4, BROWN** directed UC#1

and UC#2 to respond to an apartment building at 2251 NE 71st Street, Gladstone, Missouri. Upon

arrival, UC#1 contacted **BROWN** via **Target Account 4** to tell him he/she arrived. **BROWN**

exited an apartment, walked to the undercover vehicle, and got inside. **BROWN** handed UC#1 a

bag of suspected marijuana. UC#1 handed **BROWN** $200 in exchange. While the transaction was

occurring, UC#1 and UC#2 observed a handgun tucked under **BROWN's** armpit as **BROWN**

leaned forward. UC#2 saw the barrel of the firearm pointed in his/her direction. UC#1 and UC#2

began to comment about the firearm. **BROWN** then took the firearm out from under his armpit

and showed it to UC#1 and UC#2, who observed the firearm to be a black Glock handgun.

**BROWN** stated the firearm was a "10 mm." **BROWN** pointed the firearm in the direction of UC#1

14

multiple times while he was displaying the firearm. UC#2 asked how much a firearm like that "goes for." **BROWN** replied "$500." Following the transaction, **BROWN** exited the undercover vehicle and returned to the apartment. The purchased substance field-tested positive for THC, the active ingredient in marijuana.

34.     On February 5, 2021, UC#1 contacted **BROWN** via **Target Account 4** and arranged to purchase marijuana from him. Utilizing **Target Account 4, BROWN** directed UC#1 and UC#2 to respond to the apartment building at 2251 NE 71st Street, Gladstone, Clay County, Missouri. Upon arrival, UC#1 contacted **BROWN** via **Target Account 4** to tell him he/she arrived. **BROWN** exited an apartment, responded to the passenger's side window of the undercover vehicle, and handed UC#1 and UC#2 a bag of suspected marijuana. UC#1 and UC#2 handed **BROWN** $60 in exchange. UC#2 asked **BROWN** if he/she could have **BROWN's** phone number in case UC#2 wanted to contact him for the purpose of purchasing purported marijuana. **BROWN** gave (816) 838-2779 as his phone number. Following the transaction, **BROWN** returned to the apartment. The purchased substance field-tested positive for THC, the active ingredient in marijuana.

35.     On February 8, 2021, the Honorable W. Brian Gaddy, United States Magistrate Judge, Western District of Missouri, signed a warrant authorizing a search of the apartment **BROWN** was observed entering at 2251 NE 71st Street, Gladstone, Missouri (warrant number 21-SW-00065-WBG).

36.     On February 10, 2021, at approximately 9:35 a.m., UC#1 contacted **BROWN** via **Target Account 4** and arranged for the purchase of one ounce of marijuana from **BROWN** for $175. UC#1 and UC#2 responded to 2251 NE 71st Street, Kansas City, Missouri and met with **BROWN**. **BROWN** handed UC#1 a bag of marijuana. UC#1 handed **BROWN** $180 in exchange,

15

and **BROWN** gave UC#1 five dollars in change. Following the transaction, UC#1 and UC#2 left the area. The purchased substance field-tested positive for THC, the active ingredient in marijuana.

37.     At approximately 9:50 a.m., ATF SAs and Task Force Officers ("TFO") served a federal search warrant at an apartment located within 2251 NE 71st Street, Gladstone, Missouri. **BROWN** and two other individuals were located in the living room, as well as an additional individual in a bedroom of the apartment. ATF agents located a Glock brand, 20 model, 10-millimeter handgun bearing serial number BNAV724 in the bathroom. Agents also located approximately 20.64 grams of suspected marijuana and 10-millimeter ammunition in the bedroom. Agents located additional ammunition, to include an extended magazine with 37 rounds of 10-millimeter ammunition in a red backpack, located in the living room floor. Agents located an iPhone, baggies, a scale, and approximately one gram of suspected marijuana on the kitchen counter. All suspected marijuana recovered from the residence was field tested and gave a positive result for THC, the active ingredient in marijuana.

38.     Based upon my training and experience, I am aware that persons involved in distributing controlled substances commonly keep and maintain firearms to protect themselves and their inventory from other drug traffickers and from apprehension by law enforcement officers. The possession of firearms by individuals in the drug trade therefore furthers their distribution of controlled substances.

39.     Based on my training, experience, and knowledge of this investigation, I believe that the servers of Snap Inc. are likely to contain information stored about electronic communications and information of the **Target Accounts 1–4** relating to the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846, 843(b), as well as 18 U.S.C. § 924(c).

16

40.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Snap Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B1–2. Upon receipt of the information described in Section I of Attachment B1–2, government-authorized persons will review that information to locate the items described in Section II of Attachment B1–2.

## CONCLUSION

41.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Snap Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time of the day or night.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
Elizabeth A. Gentry
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn to before me via telephone or other reliable electronic means on this _4th_ day of March 2021.

_____
HONORABLE JILL A. MORRIS
United States Magistrate Judge
Western District of Missouri

17